IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ARTHUR J. PETRIKONIS,<br><br>        Plaintiff,<br><br>v.<br><br>WILKES-BARRE HOSPITAL COMPANY, LLC,<br><br>        Defendant. | CIVIL ACTION<br>NO. 11-280 |

**OPINION**

**Slomsky, J.**                                                                    **October 30, 2013**

## I. INTRODUCTION

This case involves an allegation of employment discrimination. On February 10, 2011, Plaintiff Arthur Petrikonis ("Plaintiff") filed a Complaint against Wilkes Barre Hospital Company, LLC ("Defendant" or "Hospital"). (Doc. No. 1.) In his Complaint, Plaintiff alleges he was terminated on account of his gender and age in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), and the Pennsylvania Human Relations Act ("PHRA"). Plaintiff seeks back pay, compensatory damages, attorney's fees, and a permanent injunction barring Defendant from discriminating against employees. (Id. 13-14.) Defendant filed an Answer and a Counterclaim for breach of contract. (Doc. No. 10.)

On April 23, 2012, Defendant filed a Motion for Summary Judgment on both the discrimination and breach of contract claims. (Doc. No. 44.) Defendant's Motion and Plaintiff's

1

Response have been fully briefed by the parties and the Motion is now ripe for disposition.[1] For reasons that follow, Defendant's Motion for Summary Judgment will be granted.

## II. FACTUAL BACKGROUND

Plaintiff Arthur Petrikonis is a fifty-three year old male. Defendant Wilkes Barre Hospital is a community-based hospital located in Northeastern Pennsylvania. (Doc. No. 1 at ¶¶4-7.) From 1995 to 1996, Plaintiff worked for Defendant as a phlebotomist. (Doc. No. 44-2 at ¶6.) He then left the healthcare industry for seven years. (Id. at ¶7.) In 2003, Plaintiff returned to work at the Hospital and began attending classes at Luzerne County Community College ("LCCC") in pursuit of an Associate's Degree in Registered Nursing. (Id. at ¶10.) In 2009, Plaintiff applied for and received a $10,000 student loan from the Hospital to pursue his degree in Nursing at LCCC.[2] (Id. at ¶11.) On March 2, 2009, Plaintiff signed an Employment Commitment Letter in connection with this loan, stating in part:

> You have been tentatively selected for aid in WVHCS – NURSING EDUCATION ALLIANCE PROGRAM – REGISTERED NURSE (hereinafter referred to as "Program"), in the amount referenced above. Designation of you, as an actual recipient of this aid, is contingent upon your execution of this Employment Commitment Letter and attached Promissory Note. . .

---

[1] In deciding Defendant's Motion for Summary Judgment, the Court has considered the Motion and Defendant's Statement of Undisputed Material Facts (Doc. No. 44), Defendant's Supporting Memorandum of Law (Doc. No. 46), the Complaint (Doc. No. 1), Defendant's Answer and Counterclaim (Doc. No. 10), Plaintiff's Answer to the Counterclaim and Affirmative Defenses (Doc. No. 13), Plaintiff's Answer to Defendant's Statement of Facts (Doc. No. 52), Plaintiff's Supplement to Answer to Statement of Facts (Doc. No. 53), Plaintiff's Opposition to Motion for Summary Judgment (Doc. No. 55), Defendant's Reply Brief (Doc No. 58), Plaintiff's Sur Reply Brief (Doc. No 67), and Defendant's Responses to Plaintiff's Sur Reply Brief (Doc. Nos. 69, 70).

[2] The loan would be forgiven if Plaintiff fulfilled the conditions associated with the loan as set forth in an "Employment Commitment Letter" and a "Promissory Note."

2

> SECTION 1 – EMPLOYMENT COMMITMENT
> In return for the funds received from the Program, I, the undersigned, do hereby agree to full-time employment as a staff nurse for the following relevant period:
>
> A three (3) year period of continuous employment as a licensed/registered professional employee beginning on date of licensure based on full-time status. If, I, the undersigned, opt for part-time employment, the employment commitment will be extended to five (5) years.
>
> In the event that I, the undersigned, am unable to fulfill the Employment Commitment as a staff nurse for any reason, fail to pass a licensure examination (within six (6) months of graduation), or if I am terminated from employment for just cause before completion of the commitment period, I hereby agree to repay the portion of the loan that has not yet been forgiven, within three (3) months.

(Doc. No. 44-4 at 2.) On March 2, 2009, Plaintiff executed this agreement and signed a Promissory Note, stating:

> I, Arthur J. Petrikonis (hereinafter referred to as "Borrower"), for the value received, the receipt and sufficiency of which is hereby acknowledged, understand and agree that, unless I fulfill the obligations set forth in the Employment Commitment Letter attached hereto and incorporated herein, which I have entered into with WVHCS-Hospital (hereinafter referred to as "Hospital"), I am obligated to repay the total of each principal sum of the semester(s) in which I accept aid, with simple interest at the then current standard market rate of interest per annum, as published annually by the U.S. Internal Revenue Service, until paid, together with any and all changes which may become due as provided in this Note. Borrower may, at any time, prepay all or any part of the unpaid balance without penalty.

(Id. at 4.) Plaintiff received the $10,000 loan and agreed to the terms of the Promissory Note and Employment Commitment Letter.

During his clinical rotations as a nursing student, Plaintiff went through various patient care units at the Hospital. Towards the end of his Associate's Program at LCCC, the Department of Nursing advised him that his first choice for placement on the Hospital's 5East (orthopedic)

3

Unit ("5E") had been granted and he would begin working on 5E in July 2009. He finished his clinical rotations and graduated from LCCC in May 2009. In July 2009, Plaintiff failed his nursing board examination. Subsequently, he continued working as a phlebotomist until he passed his Nursing examination in late October 2009.

On November 9, 2009, Defendant hired Plaintiff as a Registered Nurse and he began his assignment on 5E. His employment with the Hospital was pursuant to the terms of the Employment Commitment Letter. (Doc. No. 1 at ¶19.) At the time, 5E employed seventeen Registered Nurses. The Clinical Director of 5E was Judy Ragukas, who supervised Mary Beth Moss, the Clinical Leader. Moss was responsible for the day-to-day nursing care on 5E. The Orientation Program for nurses on 5E consisted of an 8-12 week program. The majority of the orientations were run by Pat Chivarella and Mary Carol Montagna, the most experienced nurses on 5E at that time. During the first six weeks of the Orientation Program, new nurses worked the 7:00 a.m. to 3:00 p.m. shift ("First Shift"), after which the nurse would be transferred to the shift he or she would be working full time. (Doc. No. 44-2 at ¶31.)

Chivarella served as Plaintiff's first preceptor and trained him on "the basics" of nursing. (Id. at ¶43.) By mid-November, Chivarella observed that Plaintiff had failed to progress and she spoke to Ragukas repeatedly about his lack of progress. (Id. at ¶¶52-59.) Subsequently, the Hospital switched Plaintiff's preceptor from Chivarella to Montagna. (Id. at ¶61.) Montagna made similar observations about his performance and spoke to Moss about her concerns. (Id. at ¶68.)

All nurses working on the Orthopedic Unit at the time were required to successfully obtain a "med pass" with the Unit's Clinical Leader, Moss, during their orientation. (Id. at ¶75.) A "med pass" is an assessment of whether a nurse is capable of administering medications in

accordance with the applicable policies and procedures. (Id. at ¶74.) On December 8, 2009, Moss conducted a med pass assessment of Plaintiff. (Id. at ¶76.) Plaintiff did not perform well, so Moss scheduled a second med pass assessment for him. (Id. at ¶78.) Moss' conclusions about the second med pass were consistent with the earlier observations of Montagna and Chivarella: "He is not building on any skill or procedure that was accomplished the previous day; shows no initiative to complete a task on his own. He requires constant supervision or direction." (Id. at ¶81).

Based on the feedback from the med pass assessments and Plaintiff's preceptors, Moss and Ragukas prepared an Improvement Action Plan ("IAP") for Plaintiff. (Id. at ¶83.) The IAP identified problem areas for Plaintiff to work on, with the understanding that he would be terminated if he did not improve on his overall performance. (Id. at ¶¶85-87.) Ragukas advised Plaintiff that she would re-evaluate his performance on December 16, 2009. (Id. at ¶88.) During the period of his IAP, Montagna and Ragukas observed specific care issues in Plaintiff's charts and observed that he was still unable to complete an assignment without direction or supervision. (Id. at ¶98.) Therefore, on December 16, 2009, during the fifth week of Orientation, Ragukas decided to terminate Plaintiff's employment. Because he worked at the Hospital for five weeks after graduation, $256.42 of the $10,000 student loan was forgiven, leaving a balance of $9,743.58. The Hospital sought repayment of the amount due, but Plaintiff refused to repay the outstanding amount.

Plaintiff alleges he was not adequately trained by the nurses on 5E. Specifically, Plaintiff contends he was not given the opportunity to shadow a preceptor, was not given a training manual, and was not given training goals or objectives. (Doc. No. 1 at ¶¶21-24). With respect to the IAP, Plaintiff avers that the problems identified had no basis and were unwarranted in view of

his level of training and orientation. Further, he contends the IAP provided an inadequate period of time in which to assess his work in response to the purported problems. (Id. at ¶¶28, 29). Notwithstanding the IAP, Plaintiff maintains that he developed many of the required skills and competently performed his work as a registered nurse. (Id. at ¶¶30-45.) Finally, Plaintiff asserts that the Hospital treated younger nurses and female nurses more favorably. (Id. at ¶¶25, 26.) Accordingly, Plaintiff claims that the reasons stated by the Hospital for his termination were pretextual and that he was dismissed and discriminated against on account of his age and gender. The Hospital denies these claims, and has counterclaimed for repayment of the $9,743.58 due on the Promissory Note, as well as attorneys' fees and costs.

### III. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reaching this decision, the court must determine "whether the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact and whether the moving party is therefore entitled to judgment as a matter of law." Macfarlan v. Ivy Hill SNF, LLC., 675 F.3d 266, 271 (3d Cir. 2012) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). A disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A factual dispute is "material" only if it might affect the outcome of the suit under governing law. Doe v. Luzerne Cnty., 660 F.3d 169, 175 (3d Cir. 2011) (citing Gray v. York Papers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992)). The Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. Anderson, 477 U.S. at 247-49.

The movant "bears the initial burden of identifying those portions of the record that it believes illustrate the absence of a genuine issue of material fact." Mendoza v. Gribetz Intern., Inc., No. 10-1904, 2011 WL 2117610, at *2 (E.D. Pa. May 27, 2011) (citing Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). If the movant makes such a showing, "then the burden shifts to the non-movant, who must offer evidence that establishes a genuine issue of material fact that should proceed to trial." Id.; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).

In deciding a motion for summary judgment, the Court must view the evidence, and make all reasonable inferences from the evidence, in the light most favorable to the non-moving party. Macfarlan, 675 F.3d at 271; Bouriez v. Carnegie Mellon Univ., 585 F.3d 765, 770 (3d Cir. 2009). Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the non-moving party's evidence over that presented by the moving party. Anderson, 477 U.S. at 255. If there is no factual issue and if only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party. Id. at 250.

## IV. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT WILL BE GRANTED ON BOTH THE EMPLOYMENT DISCRIMINATION AND BREACH OF CONTRACT CLAIMS

Defendant moves for summary judgment on Plaintiff's employment discrimination claim and its own counterclaim for breach of contract. The crux of both claims is whether the evidence raises a genuine issue of fact regarding the reason for Plaintiff's termination.[3] Because the analytical framework required for Plaintiff's claim of employment discrimination requires an in-depth examination of the facts, the Court first addresses the issue of whether Plaintiff's

---

[3] Pursuant to the terms of his employment contract, Plaintiff is not required to repay the balance of his student loan if Defendant fired him without cause. Plaintiff's defense to the breach of contract claim is that he was fired because of his age and gender and hence without cause.

7

termination violated Title VII, the ADEA, or the PHRA. Thereafter, the Court will examine whether Plaintiff breached his employment contract by not repaying his student loan.

### A. No Genuine Issue of Material Fact on the Employment Discrimination Claim Has Been Shown

#### i. The McDonnell Douglas Burden-Shifting Analysis

Claims of gender and age discrimination under Title VII,[4] the ADEA[5] and the PHRA[6] are examined under the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).[7] Under this analysis, the plaintiff "must carry the initial burden under the statute of establishing a prima facie case of . . . discrimination." Id. at 802. If a prima facie case has been established, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Id. If the employer is able to provide such a reason, the burden shifts back to the plaintiff to produce "sufficient evidence to

---

[4] Title VII provides, in pertinent part: "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1).

[5] The ADEA states that an employer shall not "discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . . ." 29 U.S.C. § 623(a)(1).

[6] In pertinent part, the PHRA states: "[i]t shall be an unlawful discriminatory practice ... [f]or any employer because of the . . . age [or] sex . . . of any individual . . . to discharge from employment such individual . . . or to otherwise discriminate against such individual . . . with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual . . . is the best able and most competent to perform the services required." 43 Pa. Stat. Ann. § 955(a).

[7] There is no direct evidence of discrimination in this case. Therefore, the burden-shifting analysis set forth in McDonnell Douglas applies. See Fasold v. Justice, 409 F.3d 178, 184 (3d Cir. 2005) (holding that a plaintiff may establish employment discrimination by either "(1) presenting direct evidence of discrimination or (2) by presenting indirect evidence of discrimination that satisfies the familiar three-step framework of McDonnell Douglas.") (internal citations omitted.).

8

raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action." Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1067 (3d Cir. 1996). "At all times, however, the burden of persuasion rests with the plaintiff." Smith v. City of Allentown, 589 F.3d 684, 689-90 (3d Cir. 2009).

To make out a prima facie case of gender discrimination in this case, Plaintiff must show that "(1) he is a member of a protected class; (2) he was qualified for the position he sought to attain or retain; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008) (citing McDonnell Douglas, 411 U.S. at 802; Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1066 n. 5 (3d Cir.1996) (en banc)).

A prima facie case of age discrimination is made by a "showing first, that the plaintiff is forty years of age or older; second, that the defendant took an adverse employment action against the plaintiff; third, that the plaintiff was qualified for the position in question; and fourth, that the plaintiff was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus." Smith v. City of Allentown, 589 F.3d 684, 689-90 (3d Cir. 2009) (citing Potence v. Hazleton Area Sch. Dist., 357 F.3d 366, 370 (3d Cir. 2004)). Defendant concedes that Plaintiff has established a prima facie case of discrimination based on both age and gender. (Doc. No. 46 at 9.) Therefore, the Court focuses on the next stage of the analysis: whether Defendant's reason for firing him is legitimate or pretextual.

### ii. The Decision To Fire Plaintiff Was Supported By Legitimate, Non-Discriminatory Reasons

The Hospital submits that Plaintiff was fired because of his subpar job performance. (Doc. No. 46 at 5.) The Hospital bears the initial burden of showing the absence of a genuine issue of fact as to whether this proffered reason is legitimate and non-discriminatory. Mendoza

v. Gribetz Intern., Inc., No. 10-1904, 2011 WL 2117610, at *2 (E.D. Pa. May 27, 2011) (citing Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). To meet this burden, the Hospital has presented evidence that Plaintiff performed poorly on the job, and that the Hospital attempted to help him by scheduling a second med pass and creating an IAP to focus on the areas of his performance that needed the most improvement.[8] (Doc. No. 44-2 at ¶¶78, 83.) Despite this assistance, the Hospital submits that Plaintiff had to be terminated because his performance "was nowhere near the level expected of a nurse in his/her fifth week of orientation." (Doc. No. 46 at 5.)

There is "only one reasonable conclusion [that] could arise" from a review of the Hospital's evidence: Plaintiff was fired because of his substandard job performance, not because of his age or gender.[9] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). The evidence establishes that his poor performance began almost immediately. In her written Orientation Evaluation, Chiverella commented that within the first two weeks of training Plaintiff needed to "use critical thinking skills," indicating that he lacked those skills. (Doc. No. 44-8.) On November 17, 2009, he was advised in writing that he needed to "use critical thinking with all procedures." (Doc. No. 44-9 at 2.) On December 1, 2009, Moss wrote in her weekly progress report that Plaintiff required "direction with charting and 'pt' care" and needed "organization

---

[8] The evidence submitted by Defendant includes: Defendant's Statement of Undisputed Material Facts (Doc. No. 44) and the following attached exhibits: the Deposition of Plaintiff Arthur Petrikonis (Doc. No. 44-3); Plaintiff's Employment Commitment Letter (Doc. No. 44-4); the Deposition of Judy Ragukas (Doc. No. 44-5); the Affidavit of Judy Ragukas (Doc. No. 44-6); the Deposition of Patricia M. Chiverella (44-7); Plaintiff's Orientation Evaluation (Doc. No. 44-8); Plaintiff's Weekly Orientee Progress Records from Chiverella and Moss (Doc. Nos. 44-9; 44-12); the Deposition of Mary Carol Montagna (Doc. No. 44-10); the Deposition of Mary Beth Moss (Doc. No. 44-11); Plaintiff's Med Pass Evaluations (Doc. No. 44-13); the Affidavit of Mary Beth Moss (Doc. No. 44-14); Plaintiff's Improvement Action Plan (Doc. No. 44-15); the records and charts of several patients treated by Plaintiff (Doc. Nos. 44-16; 44-17; 44-18; 44-19; 44-20); and Plaintiff's termination letter (Doc. No. 44-22).

[9] Notably, of the seventeen registered nurses on 5E, seven were older than Plaintiff and there was one other male. (Doc. No. 44-6 at ¶4; Doc. No. 52 at 3.)

with tasks [and] care to work independently." (Doc. No. 44-12 at 2.) In his deposition, Plaintiff agreed with these observations:

> Q: Okay. Let's that a look at the [weekly progress report]. And let me ask you: Are any of these criticisms—well, are any of these comments, excuse me, as you sit here today false? And I am looking only at the entry for 12/1/09.
>
> A: No.
>
> Q: Okay. So if the person who wrote this said that as of 12/1/09 you required direction with respect to charting and patient care, that you needed organization with respect to tasks and care to work independently, that's accurate, correct?
>
> A: Correct.

(Doc. No. 44-3 at 39.)

On the same progress report, Moss wrote that Plaintiff was unable to complete a full assignment on his own because he was taking too long on each task. (Doc. No. 44-12 at 2-3.) Moss also noted that Plaintiff was "not building on the skill or task accomplished the prior [shift]" and that he "require[d] as much direction as day one." (Id.)

On December 8, 2009, Plaintiff attempted his first med pass with Moss. On the written med pass evaluation Moss made the following observations:

1. [He] [n]eeded constant direction. . . . He was unable to proceed through one process of administering meds to a patient without checking each step with me even when I instructed him to do so.

2. [He] took 35 minutes to complete [IV tubing preparation]. [T]he process should have taken 5 minutes.

3. Removing meds from the PYXIS took an unacceptable amount of time . . . I showed and explained [how to use both PYXIS machines] to Art only to find the next time a med was not loaded in the PYXIS[.] Art did not remember to look in the other one before saying he could not find the med.

4. [B]ecause of the focus on each individual step . . . [I was unable] to establish any confidence that Art could pass meds on a patient assignment in a timely fashion without constant supervision.

(Doc. No. 44-13 at 2.)

Still, Moss decided to "give [Plaintiff] the opportunity to pass meds again." (Id.) On December 9, 2009, Plaintiff attempted his second med pass, but in her evaluation Moss found that he failed to use previously-taught skills, failed to follow previously-explained instructions, failed to write down a patient's insulin level and then reported an incorrect level, took twenty minutes to do a procedure that should have taken five minutes, and took an hour and forty-five minutes to administer two-thirds of the medications scheduled for 10 a.m. (Id. at 2-3.) In the final paragraph of her evaluation, Moss wrote:

> [Plaintiff] felt he did better today but in retrospect as we reviewed the day with Art [h]e really gave a minimal amount of meds and even fewer that did not require supervision or intervention. He is not building on any skill or procedure that was accomplished the previous day [and] shows no initiative to complete a task on his own[.] He requires constant supervision or direction.

(Id. at 3.) The following day, Plaintiff signed an Improvement Action Plan ("IAP"). (Doc. No. 44-15.) The IAP identified seven problem areas with corresponding "plans" to help Plaintiff improve. (Id.) The listed problem areas were:

> (1) inability to obtain medications from PYXIS . . . within a reasonable timeframe [sic] and without direction; (2) inability to identify proper injection sites; (3) inability to complete documentation of his assigned patients accurately, completely and within a reasonable timeframe [sic]; (4) inability to independently prime and administer IV medications; (5) inability to complete a reasonable assignment of 2 patients in a timely fashion and is on week four of orientation; (6) has not yet taped report for the next shift; (7) was unable to obtain verification of accucheck [glucometer] results from accucheck machine.

(Id.) The IAP also listed a re-evaluation date of December 16, 2009. (Id.) Plaintiff testified that he understood that he would be terminated if he did not improve his "overall performance" by the re-evaluation date. (Doc. No. 44-3 at 50.) Testimony and patient records confirm that while on the IAP, he continued to make mistakes with patient care, including failing to tell a patient's physician that the patient was experiencing chest pain, repeatedly failing to document bowel

12

movements for multiple patients, writing illegibly on patients' charts, and improperly administering medication. (Doc. Nos. 44-16-44-21.) Finally, Defendant fired Plaintiff because his performance "was nowhere near the level expected of a nurse in his/her fifth week of orientation." (Doc. No. 46 at 5.) Based on this well-documented evidence, Defendant's proffered reason for firing Plaintiff is legitimate, non-discriminatory, and supported by an overwhelming amount of evidence.

In order to survive a motion for summary judgment after a defendant has articulated a legitimate, non-discriminatory reason for the adverse employment action, a plaintiff must produce "sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action." Harding v. CareerBuilder, LLC, 168 Fed. App'x. 535, 538 (3d Cir. 2006) (quoting Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1067 (3d Cir. 1996)). The Third Circuit has articulated three possible ways to make this showing. See Harding v. CareerBuilder, LLC, 168 Fed. App'x. 535, 538 (3d Cir. 2006). The plaintiff can submit evidence "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge." Id. Plaintiff has not established pretext under any of these theories.

First, Plaintiff admits that he made mistakes during his orientation training. Therefore, Plaintiff does not argue that the Hospital's proffered reason for his termination had no basis in fact. Instead, Plaintiff argues that these mistakes "did not actually motivate his discharge" because other younger, female trainees made similar mistakes and were not terminated. Id. He also contends that his mistakes "were insufficient to motivate discharge" because they were minor errors. Id.

To support these arguments, Plaintiff relies heavily on two reports written by his expert witness, Susan Dule.[10] Dule is a registered nurse who works as a Legal Nurse Consultant. As part of her consulting, she reviews medical records. Dule's first report, totaling five pages, critiqued several aspects of the Hospital's orientation program and stressed that more guidance should have been given to new nurses, including Plaintiff. (Doc. No. 56-1 at 1.) As far as specific allegations of poor job performance, Dule analyzed three incidents relating to Plaintiff but was unable to give an opinion on two of them. (Id. at 2, 3.) In response to Ragukas' assertion that Plaintiff failed to properly record the time that a patient went into the operating room, Dule found that Ragukas was correct but that "this type of error does occur and does not impact the safety or care of the patient." (Id. at 3.)

In her second report, Dule focused on the job performance of Korraine Murgallis, a young female nurse who was also a trainee. Dule found that Murgallis made several mistakes. She also found that Plaintiff's work product was "equal to" other trainees and nurses on the floor. (Doc. No. 52-3 at 3.)

Even when read in the light most favorable to Plaintiff, these reports do little to undermine Defendant's reasons for terminating Plaintiff. The first report mostly focuses on the Hospital's poor orientation program and Chivarella's poor guidance. However, there is no indication that Plaintiff was given any less guidance than any other new nurse. Additionally, the first report confirms that Plaintiff made at least one mistake while on the job.

The second report attempts to establish pretext by contending that at least one younger female employee made mistakes but was not fired. However, "[w]hile such comparative

---

[10] Viewing the evidence in "the light most favorable to the non-moving party," the Court assumes that Dule qualifies as an expert. Macfarlan v. Ivy Hill SNF, LLC., 675 F.3d 266, 271 (3d Cir. 2012); Bouriez v. Carnegie Mellon Univ., 585 F.3d 765, 770 (3d Cir. 2009).

14

evidence may show pretext, it is only relevant if the comparators are 'similarly situated.'" Maull v. Div. of State Police, 39 F. App'x 769, 773 (3d Cir. 2002) (finding co-workers were not similarly situated where the plaintiff, unlike his co-workers, had an extensive disciplinary record.) Here, Plaintiff had a record of poor job performance and was required to participate in an IAP. There is no evidence that Murgallis had a similar record of poor job performance or that Murgallis was ever given an IAP. The fact that one other nurse sometimes made mistakes is not enough to establish pretext.

Finally, there is no evidence that poor job performance was not the actual motivation for Plaintiff's discharge or that this reason was insufficient to warrant termination. In addition, there is no evidence that any of Plaintiff's supervisors made discriminatory statements to him or anyone else regarding his age or gender. However, there is substantial testimonial evidence from both Plaintiff and his supervisors indicating that he was not a satisfactory employee and that this fact alone led to his termination. This testimonial evidence is supported by Plaintiff's weekly progress reports, orientation evaluation, and other Hospital records. The record in this case substantiates beyond peradventure that the decision to terminate Plaintiff was motivated by his lack of progress, which is a legitimate, non-discriminatory reason for terminating employment.

In sum, the record is devoid of any evidence that Plaintiff was terminated due to his age or gender. Plaintiff has failed to produce evidence to raise a genuine issue of fact as to whether Defendant's proffered reasons for firing him were mere pretext. Sheridan, 100 F.3d at 1067. Because there is no genuine issue of material fact as to the reason for Plaintiff's termination, Defendant's Motion for Summary Judgment on the claims of gender and age discrimination will be granted.

### B. No Genuine Issue of Material Fact on the Breach of Contract Claim Has Been Shown

There is no genuine issue of material fact as to whether Plaintiff breached his employment contract by not repaying his student loan. Plaintiff does not dispute that he entered into a contract with Defendant when he signed the Employment Commitment Letter and Promissory Note. Under the terms of the Employment Commitment Letter, Defendant loaned Plaintiff $10,000 in exchange for three years of employment. The agreement states:

> In the event that I, the undersigned, am unable to fulfill the Employment Commitment as a staff nurse for any reason . . . or if I am terminated from employment for just cause before completion of the commitment period, I hereby agree to repay the portion of the loan that has not yet been forgiven, within three (3) months.

(Doc. No. 44-4 at 2.) Given these terms, and his justified dismissal from the Hospital, Plaintiff was in breach of the terms of the Employment Commitment Letter and the Promissory Note, and a refund is required. Plaintiff's defense is that Defendant fired him without just cause. However, as discussed at length above, Defendant's decision to fire Plaintiff was based on Plaintiff's lack of progress. The decision was not based upon gender or age discrimination. Accordingly, Plaintiff was terminated for just cause and must repay the remaining balance of $9,743.58.

### V. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. No. 44) will be granted in its entirety. An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ARTHUR J. PETRIKONIS,

    Plaintiff,

v.

WILKES-BARRE HOSPITAL COMPANY, LLC,

    Defendant.

CIVIL ACTION
NO. 11-280

## ORDER

**AND NOW**, this 30th day of October 2013, upon consideration of Defendant's Motion for Summary Judgment and Statement of Undisputed Material Facts (Doc. No. 44), Defendant's Supporting Memorandum of Law (Doc. No. 46), the Complaint (Doc. No. 1), Defendant's Answer and Counterclaim (Doc. No. 10), Plaintiff's Answer to the Counterclaim and Affirmative Defenses (Doc. No. 13), Plaintiff's Answer to Statement of Facts (Doc. No. 52), Plaintiff's Supplement to Answer to Statement of Facts (Doc. No. 53), Plaintiff's Opposition to Motion for Summary Judgment (Doc. No. 55), Defendants' Reply Brief (Doc No. 58), Plaintiff's Sur Reply (Doc. No. 67), Defendant's Responses to Plaintiff's Sur Reply Brief (Doc. Nos. 69, 70), and in accordance with the Opinion of the Court issued this day, it is **ORDERED** that:

1. Defendant's Motion for Summary Judgment is **GRANTED** in its entirety.

2. A separate Order will be filed regarding Plaintiff's obligation to repay the $9,743.58 to Defendant.

BY THE COURT:

*Joel Slomsky*
JOEL H. SLOMSKY, J.